JUSTICE SAMOUR, dissenting.
*814 ¶ 38 Billy Joel aptly recognized in one of his hit songs that "we're only human" and are "allowed to make [our] share of mistakes." Billy Joel, You're Only Human (Second Wind), on Billy Joel's Greatest Hits (Columbia Rec. 1985). Yet, today, the majority suppresses evidence derived from a search conducted as a result of a juvenile probation officer's mistake of law, without meaningfully analyzing whether the mistake was objectively reasonable. Because the ultimate touchstone of the Fourth Amendment is reasonableness-not perfection-and because the exclusionary rule does not seek to deter objectively reasonable mistakes, I respectfully dissent.
I. Introduction
¶ 39 The majority discusses this case's factual and procedural history in some detail. Maj. op. ¶¶ 7-15. Therefore, I do not repeat it here.
¶ 40 I agree with the majority that, since the People did not seek review of the court of appeals' conclusion that Casillas's cheek swab violated both the DNA collection statutory provision in question and the Fourth Amendment, the only issue before us is whether application of the exclusionary rule is warranted as a remedy. Id., ¶17. In analyzing this question, I have no qualms with the majority's determinations that juvenile probation officers are more akin to "adjuncts to the law enforcement team" than to judicial officers or court employees, see id., ¶27, and that the juvenile probation officer who collected Casillas's cheek swab did not rely on misinformation provided by a third party, see id., ¶26. Further, like the majority, I cannot side with the court of appeals' determination that suppression of the cheek swab is not justified because the juvenile probation officer was simply performing a supervisory function pursuant to instructions from the juvenile court. Id., ¶28.
¶ 41 Where my colleagues and I part ways is (1) in their implied conclusion that the mistake of law by the juvenile probation officer was not objectively reasonable and, instead, rose to the level of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights or recurring or systemic negligence, see id., ¶¶34-35;[1] and (2) in their determination that suppression would have a deterrent effect because, otherwise, "the incentive exists to take DNA from every juvenile whether authorized or not,"see id., ¶36. These two disagreements are significant because the question of suppression "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." Herring v. United States, 555 U.S. 135, 137, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). I address each point of contention in turn.
II. Analysis
A. The Mistake of Law Was Objectively Reasonable
¶ 42 In Heien v. North Carolina, --- U.S. ----, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014), the United States Supreme Court addressed whether a traffic stop based on a police officer's mistaken understanding of the law violated the Fourth Amendment. There, an officer pulled over a car after noticing that only one of its brake lights was functional. Id. With the defendant's consent, two officers searched the car and found cocaine. Id. The defendant was subsequently charged with a cocaine trafficking offense. Id. at 535. Before trial, the court denied the defendant's motion to suppress the evidence recovered from the car, rejecting his argument that the stop and search violated the Fourth Amendment. Id.
¶ 43 The North Carolina Court of Appeals reversed, holding that the stop was objectively unreasonable and ran afoul of the Fourth Amendment because the vehicle code required only one working brake light.[2] Id. On appeal, the prosecution did not challenge the *815 intermediate appellate court's interpretation of the vehicle code; consequently, the North Carolina Supreme Court assumed that Heien's faulty brake light was not a violation of the vehicle code. Id. But the North Carolina Supreme Court nevertheless concluded that the stop was valid and consistent with the Fourth Amendment because the officer's mistaken interpretation of the law was reasonable. Id.
¶ 44 The United States Supreme Court agreed. The Court emphasized that "[t]o be reasonable is not to be perfect," and since the Fourth Amendment's "ultimate touchstone ... is reasonableness," it "allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." Id. at 536 (quoting Riley v. California, 573 U.S. ----, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) ) (internal quotation marks omitted). The Court added that, just as searches and seizures based on mistakes of fact can be reasonable, so too can searches and seizures based on mistakes of law be reasonable. Id.
¶ 45 Under Heien, an officer may be reasonably mistaken on the facts or on the law, but
[w]hether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.
Id."[T]reating legal and factual errors alike in this context" is nothing new; it is supported by "cases dating back two centuries." Id. at 536-37.
¶ 46 Casillas argues that Heien does not apply here because, rather than address the scope of the exclusionary rule, it found that no violation of the Fourth Amendment occurred. However, the Court in Heien acknowledged that, in previous decisions, it has "looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all." Id. at 539. In such cases, the Court has either found or assumed a Fourth Amendment violation, and the evaluation of the reasonableness of an officer's mistake of law has been "limited to the separate matter of remedy." Id.
¶ 47 Moreover, Casillas ignores that, since mere negligence by a government official is insufficient to constitute a Fourth Amendment violation, it certainly cannot "meet the more stringent test for triggering the exclusionary rule." Herring, 555 U.S. at 145, 129 S.Ct. 695. "To trigger the exclusionary rule" as a remedy for a Fourth Amendment violation, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 144, 129 S.Ct. 695. As the Supreme Court has reiterated, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," not "mistakes [that] are the result of negligence." Id. at 144, 147, 129 S.Ct. 695.
¶ 48 Like Casillas, the majority glosses over the holding in Heien and strains to distinguish it from this case, noting that " Heien addressed an officer's misinterpretation of the law as it pertained to whether there was any Fourth Amendment violation...." Maj. op. ¶ 30. Put differently, the majority erroneously views Heien as limited to whether a Fourth Amendment violation occurred and having no relevance to whether application of the exclusionary rule is warranted. Id. The majority's overly narrow reading of Heien misconstrues the Supreme Court's analysis. Additionally, it makes no logical sense to apply one standard of "objectively reasonable mistake" to examine Fourth Amendment violations and a completely different standard of "objectively reasonable mistake" to determine application of the exclusionary rule. And, to the extent that a different standard were to be applied, it would have to be more stringent and require conduct that is more egregious in the exclusionary rule context. Herring, 555 U.S. at 144, 147, 129 S.Ct. 695.
*816 ¶ 49 There was no conduct sufficiently deliberate and sufficiently culpable here to trigger the exclusionary rule. Therefore, under United States Supreme Court jurisprudence, including Heien and Herring, the exclusionary rule is inapplicable in this case.
¶ 50 The DNA collection statutory provision in question, § 19-2-925.6, C.R.S. (2018), which addresses the "[g]enetic testing of adjudicated offenders," provides in pertinent part,
(1) Beginning July 1, 2007, each of the following adjudicated offenders shall submit to and pay for collection and a chemical testing of the offender's biological substance sample to determine the genetic markers thereof, unless the offender has already provided a biological substance sample for such testing pursuant to a statute of this state:
....
(e) Every offender sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult. This paragraph (e) shall not apply to an offender granted a deferred adjudication, unless otherwise required to submit to a sample pursuant to this section or unless the deferred adjudication is revoked and a sentence is imposed. The sample shall be collected:
(I) From an offender committed to the department of human services, by the department during the intake process but in any event within thirty days after the offender is received by the department;
(II) From an offender sentenced to county jail or to community corrections, by the sheriff or by the community corrections program within thirty days after the offender is received into the custody of the county jail or the community corrections facility;
(III) From an offender sentenced to probation, by the judicial department within thirty days after the offender is placed on probation; and
(IV) From an offender who receives any other sentence, by the judicial department within thirty days after the offender is sentenced.
§ 19-2-925.6 (emphases added).
¶ 51 Under subsection (1)(e), Casillas was not required to submit to collection of a biological substance sample because he was granted a deferred adjudication in 2008 after pleading guilty to an offense that would constitute a felony if committed by an adult. Had he not been granted a deferred adjudication and, instead, been sentenced to probation, he would have been required to provide a biological substance sample. See § 19-2-925.6(1)(e)(III). That he received a deferred adjudication meant that no adjudication entered and no sentence (including to probation) was imposed. But the question before us is not whether the juvenile probation officer violated the statute by collecting Casillas's cheek swab; there is no dispute that he did.[3] The question we are confronted with is whether the juvenile probation officer's mistaken understanding of the statute as requiring Casillas to submit a biological substance sample was objectively reasonable. The answer, in my view, is a resounding "yes."
¶ 52 The second sentence in subsection (1)(e) and the single sentence in subsection (1)(e)(III) can reasonably be read together as stating that the requirement to submit to collection of a biological substance sample does not apply to an offender who receives a deferred adjudication, "unless" such offender is "sentenced to probation." Id. Of course, as mentioned, Casillas was not "sentenced" to probation, and could not have been "sentenced"
*817 to probation, because he received a deferred adjudication. But the juvenile court ordered him supervised by probation while on his deferred adjudication. And the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication is too nuanced to allow us to fairly conclude that a juvenile probation officer's failure to discern it is a deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights. Because Casillas's deferred adjudication was ordered supervised by probation, it was objectively reasonable for the juvenile probation officer to believe, admittedly mistakenly, that subsection (1)(e) required Casillas to provide a biological substance sample.
¶ 53 Significantly, the record reflects that the juvenile probation officer was not the only one who misunderstood subsection (1)(e). The district court judge who denied Casillas's motion to suppress, an individual trained in the law who possesses legal experience, appears to have construed subsection (1)(e) as the juvenile probation officer did. The judge believed that Casillas was required to provide a biological substance sample, even though he received a deferred adjudication, because he was "sentenced to probation." In other words, the judge missed the same subtle difference in the statute the juvenile probation officer did between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication. In concluding that the juvenile probation officer did not violate the statute, the judge reasoned that the evidence at the hearing established that Casillas "had been placed on a deferred adjudication with probation,"[4] and that "[s]ubsection (e)(III) indicates that a genetic sample may be taken from an offender sentenced to probation."[5]
¶ 54 One other judicial officer in this case blurred the difference between being "sentenced to probation" and being ordered supervised by probation while on a deferred adjudication. In 2009, the judicial officer presiding over Casillas's underlying juvenile case ordered "Probation and Jurisdiction terminated successfully." (Emphasis added.) And the probation analyst referenced by the majority likewise mentioned in an email that Casillas had "completed his deferred adjudication" and had been "released from probation in May 2009." (Emphasis added.)
¶ 55 The legislature made a similar mistake in 2006 in drafting the predecessor to section 19-2-925.6, although that statute never became effective. In the 2006 Session Laws, the legislature stated:
(1) Beginning July 1, 2007, the following adjudicated delinquents must submit to and pay for a chemical testing of the person's biological substance sample to determine the genetic markers thereof:
(a) Every person sentenced on or after July 1, 2007, for an offense that would constitute a felony if committed by an adult. This paragraph (a) shall not apply to persons sentenced to probation pursuant to a deferred adjudication, unless otherwise required to submit to a sample in this section, or unless the deferred sentencing is revoked and a sentence is entered. The sample shall be collected:
....
*818 (III) For sentences to probation, no later than thirty days after the offender is placed on probation.
Ch. 339, § 19-2-925.6, 2006 Colo. Sess. Laws 1687, 1690-91 (emphases added). Thus, like the juvenile probation officer, the district court judge who denied Casillas's motion to suppress, the juvenile court judge who presided over Casillas's underlying case, and the probation analyst quoted by the majority, the 2006 legislature apparently believed that a defendant ordered supervised by probation while on a deferred adjudication was a defendant "sentenced to probation pursuant to a deferred adjudication." Id. (emphasis added).
¶ 56 Although the majority gives Heien short shrift, the Supreme Court's analysis is instructive in assessing the reasonableness of the juvenile probation officer's error of law. Notwithstanding its acknowledgement that the North Carolina statute's reference to "a stop lamp" in the singular suggested that only one working brake light was required, the Court had "little difficulty concluding that the officer's error of law was reasonable." Heien, 135 S.Ct. at 540 (emphasis in original). The Court observed that the statute also provided that "[t]he stop lamp may be incorporated into a unit with one or more other rear lamps," see id. (quoting N.C. Gen. Stat. Ann. § 20-129(g) (2007) ) (alteration and emphasis in original), which "suggest[ed] to the everyday reader of English that a 'stop lamp' [was] a type of 'rear lamp,' " see id. (quoting § 20-129(g) ). Additionally, a different subsection of the statute, subsection (d), required cars to "have all originally equipped rear lamps or the equivalent in good working order," which, the Court explained, was "arguably" an "indicat[ion] that if a vehicle has multiple 'stop lamp[s],' all must be functional." Id. (quoting § 20-129(d) ) (second alteration in original). Given the use of the word "other" in subsection (g), the Court determined that "it would at least have been reasonable to think" that the "rear lamps" referenced in subsection (d) included brake lights. Id.
¶ 57 The juvenile probation officer's mistaken understanding of subsection (1)(e) was no less reasonable than the officer's mistaken understanding of the "stop lamp" provision addressed in Heien. Just as it was reasonable for the officer in Heien to think that the North Carolina traffic code required two functional brake lights, it was reasonable for the juvenile probation officer to think that subsection (1)(e) required Casillas to submit to the collection of a biological substance sample. Moreover, as was the case with the North Carolina statute in Heien, subsection (1)(e) "had never been previously construed by [the state] appellate courts" when the mistake of law occurred. Id.
¶ 58 There is actually more proof here than in Heien that the challenged mistake of law was reasonable because, as indicated, the juvenile probation officer was not the only one who made it. Although this is a circumstance the majority disregards, it is relevant to our analysis. Cf. People v. Glasser, 293 P.3d 68, 72 (Colo. App. 2011). In Glasser, the defendant urged the trial court to suppress, among other things, the DNA evidence used to identify him because his biological substance sample was collected and uploaded onto CODIS erroneously based on a plea bargain in an earlier case that included an agreement to an illegal sentence. Id. at 72-73. As relevant here, the court of appeals refused to apply the exclusionary rule, finding that the mistake by the prosecutor could "hardly be considered flagrant, given that defense counsel approved and the trial court accepted the pleas" in the earlier case. Id. at 74. While Glasser preceded Heien, its rationale is consistent with it.
¶ 59 The majority repeatedly notes that the People failed to assert-before both the district court and the court of appeals-that Casillas's cheek swab was collected due to "a good faith mistake of fact or law." Maj. op. ¶ 11; see also id., ¶14 (explaining that Judge Webb, in his dissent, observed that the prosecution did not invoke the statutory "good faith mistake" exception under section 16-3-308, C.R.S. (2018) ). This is inherently unfair. We granted Casillas's petition for certiorari in this case to review "[w]hether the court of appeals erred when it concluded that an unreasonable search by a juvenile probation officer does not require the application of the exclusionary rule." Id., ¶ 6 n.1 (emphasis added). I do not understand how we can grant *819 certiorari review on an issue that directly deals with the applicability of the exclusionary rule, and then address the issue on the merits while tying the People's hands by silencing them with respect to a significant aspect of that rule's purview.
¶ 60 And, regardless of what arguments a party may have previously advanced, Herring makes crystal clear that " 'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." 555 U.S. at 143, 129 S.Ct. 695 (quoting United States v. Leon, 468 U.S. 897, 911, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ); see also Leon, 468 U.S. at 920, 104 S.Ct. 3405 (when it is "plainly apparent" that an officer acted reasonably, suppression of the evidence "will not further the ends of the exclusionary rule" because such suppression "can in no way affect his future conduct," except to "make him less willing to do his duty") (internal quotation marks omitted). By law, we must evaluate the flagrancy of the juvenile probation officer's conduct in order to determine whether the exclusionary rule applies. Casillas is asking us to reverse the court of appeals' decision and to apply the exclusionary rule, and we cannot properly address the merits of his request without assessing the reasonableness of the juvenile probation officer's mistake of law. Whether the juvenile probation officer's mistake of law was reasonable is at the heart of this appeal and critical to our decision.
¶ 61 Rather than meaningfully evaluate the reasonableness of the juvenile probation officer's error of law, the majority appears to conclude, rather summarily, if not circularly, both that "the search performed here was not based on any objectively reasonable interpretation of the statute," see Maj. op. ¶ 32, and that the benefits of exclusion outweigh the costs, see id., ¶¶34-35. The majority points out that (1) "the cheek swab taken by the juvenile probation officer violated the juvenile DNA collection statute"; (2) "[i]mportantly, the statutory violation here concerned the propriety of the search itself, directly implicating Casillas's Fourth Amendment rights"; (3) the juvenile probation officer "may properly be charged with knowledge[ ] that the search was unconstitutional under the Fourth Amendment"; and (4) because the juvenile probation officer "may properly be charged with [such] knowledge[ ]," "the benefits of exclusion tend to outweigh the costs." Id., ¶¶32-35. The first two points, which are undisputed, are irrelevant to whether the juvenile probation officer's mistake was objectively reasonable, and the last two points are conclusory and unaccompanied by any rationale or explanation.
¶ 62 Despite Herring's mandate, the majority seems satisfied with a standard that generally looks at whether the government official made a mistake and pays little attention to the reasonableness of the mistake. In Heien, Heien and the amici advocated for a similar standard based on "the well-known maxim, 'Ignorance of the law is no excuse,' " and argued "that it is fundamentally unfair to let police officers get away with mistakes of law when the citizenry is accorded no such leeway." 135 S.Ct. at 540. The Court was not persuaded:
Though this argument has a certain rhetorical appeal, it misconceives the implication of the maxim. The true symmetry is this: Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law. If the law required two working brake lights, Heien could not escape a ticket by claiming he reasonably thought he needed only one; if the law required only one, [the officer] could not issue a valid ticket by claiming he reasonably thought drivers needed two. But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop. And Heien is not appealing a brake-light ticket; he is appealing a cocaine-trafficking conviction as to which there is no asserted mistake of fact or law.
Id. (emphases added).
¶ 63 The majority also relies on the Colorado Children's Code Records and Information Act ("the Act") to support its decision. Maj. op. ¶ 33. This is a stretch; the Act is unavailing.
*820 There is no support for the majority's suggestion that the "heightened protection to juvenile privacy" under the Act leads to heightened protection under the Fourth Amendment or somehow expands the scope of the exclusionary rule. Id. The majority cites the legislative declaration in the Act-which provides that information obtained through juvenile proceedings is highly sensitive and has an impact on the privacy of children, and that its disclosure carries the risk of stigmatizing children-as the premise for its conclusion that the juvenile probation officer "should have known that the search of Casillas was illegal under the circumstances." Id. Respectfully, this conclusion is a non-sequitur. Neither the highly sensitive nature of information acquired through juvenile proceedings nor the risk accompanying the dissemination of such information bears on whether the juvenile probation officer's understanding of subsection (1)(e) was objectively reasonable.
¶ 64 In any event, I believe the majority misses the point. The issue is not whether the juvenile probation officer was "familiar with the provisions of the Children's Code." Id. He was obviously familiar with the provision of the Children's Code addressing the collection of DNA from juvenile offenders who receive a deferred adjudication. Indeed, he collected a cheek swab from Casillas and submitted the sample to be uploaded onto CODIS. The issue is whether the juvenile probation officer's interpretation of subsection (1)(e) was objectively reasonable.
¶ 65 Finally, the majority implies that this was recurring or systemic negligence because "the record suggests" that the improper collection of a biological substance sample from Casillas "was not an isolated incident." Id., ¶35. Again, I disagree. The record is barren of any evidence of recurring or systemic negligence.
¶ 66 The majority's reliance on a single email, which was sent by the CODIS administrator to the State Court Administrator's Office, is misplaced. That email stated: "It looks like I have another CODIS hit to an offender with a deferred sentence. Would you please check on Ismael Casillas .... It looks like he was not eligible, but I need you to confirm that." (Emphasis added.) First, this message establishes that there had been more than one CODIS match to an offender with a deferred sentence, not that there had been more than one CODIS match to an ineligible offender with a deferred sentence. Second, even under the majority's strained interpretation of the message as referring to more than one CODIS match implicating an ineligible offender with a deferred sentence, that could mean two such matches or twenty such matches, and while twenty over a relatively short period may establish "recurring or systemic negligence," two over an unknown period certainly does not.
¶ 67 In short, under the circumstances present, it was objectively reasonable for the juvenile probation officer to think that Casillas was on probation and, therefore, required to submit to collection of a biological substance sample. Because the juvenile probation officer's mistake of law was objectively reasonable, it cannot be deemed to rise to the level of deliberate, reckless, or grossly negligent disregard of Casillas's Fourth Amendment rights. Further, the record does not support a finding of recurring or systemic negligence. Accordingly, I would conclude that this case falls woefully short of the type of flagrant conduct targeted by the exclusionary rule.
B. Suppression Would Not Have a Deterrent Effect
¶ 68 The goal of the exclusionary rule is "to deter improper police conduct"; therefore, the rule should not be applied where the "deterren[t] purpose is not served." People v. Altman, 960 P.2d 1164, 1168 (Colo. 1998) (quoting People v. Deitchman, 695 P.2d 1146, 1160 (Colo. 1985) (Dubofsky, J., concurring) ). Moreover, for the exclusionary rule to apply, "the benefits of deterrence must outweigh" the heavy costs of suppressing reliable and trustworthy evidence bearing on guilt or innocence. Herring, 555 U.S. at 141, 129 S.Ct. 695. Stated differently, the deterrence must be "worth the price paid by the justice system." Id. at 144, 129 S.Ct. 695.
¶ 69 The majority posits that failure to apply the exclusionary rule here would create an "incentive [ ] to take DNA from every *821 juvenile whether authorized or not" because law enforcement "would benefit from the ability to identify more suspected perpetrators of crimes if the database were more comprehensive" and there would be no "risk that unlawfully obtained evidence would be excluded from future criminal prosecutions." Maj. op. ¶ 36. Respectfully, I am unmoved by this sky-will-fall contention. The majority forgets that "[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes-whether of fact or of law-must be objectively reasonable." Heien, 135 S.Ct. at 539 (emphases in original). In Heien, the Court rejected Heien's doomsday claim that failure to find a Fourth Amendment violation would "discourage officers from learning the law." Id. The Court explained that the subjective understanding of an officer is irrelevant. Id. Thus, "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." Id. As the majority in this case recognizes, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." Maj. op. ¶ 32 (quoting Heien, 135 S.Ct. at 539-40 ).
¶ 70 In any case, if the majority were to determine that the exclusionary rule is inapplicable here, a probation officer in the future would have a difficult, if not impossible, time convincing us that his mistake in collecting a biological substance sample from an ineligible deferred adjudication offender is objectively reasonable. This is so because there would then be precedent clarifying that a juvenile offender on a deferred adjudication for what would constitute a felony if committed by an adult is not required to submit to a biological substance sample under subsection (1)(e) simply because he is ordered supervised by probation.
¶ 71 Contrary to the majority's ruling, there is no basis in the record to find that application of the exclusionary rule serves the purpose of deterring improper conduct here. To be sure, the juvenile probation officer in this case made a mistake of law. But the mistake was objectively reasonable. Consequently, there is no flagrant conduct to be deterred here. Nor will the benefits of deterrence, if any, outweigh the heavy costs of exclusion to the justice system.
III. Conclusion
¶ 72 In sum, I respectfully disagree with the majority's decision to apply the exclusionary rule in this case. Instead, I would affirm the judgment of the court of appeals on the grounds I have articulated.

The majority states that the juvenile probation officer "may properly be charged with knowledge[ ] that the search was unconstitutional under the Fourth Amendment" and that the record before us "suggests this was not an isolated incident." Maj. op. ¶ 35.

The court focused on the code's references to "a stop lamp" and "[t]he stop lamp" in the singular. Heien, 135 S.Ct. at 535.

The majority asserts that "nothing in the record sheds light on [the juvenile probation officer's] reasons" for collecting a cheek swab from Casillas. Maj. op. ¶ 7. Respectfully, this is something of a red herring. The district court reasonably concluded from the record that Casillas "consented to the taking of the genetic material" as a condition of his supervision. The court of appeals reached the same conclusion. See People v. Casillas, 2015 COA 15, ¶ 2, --- P.3d ---- ("The terms of the deferred adjudication required [Casillas] to be under the supervision of the juvenile probation department," and "Casillas' juvenile probation officer later swabbed Casillas' cheek for a DNA sample."). Furthermore, there is no disagreement that subsection (1)(e) governs the collection-by the judicial department (which includes probation)-of any genetic or biological substance sample from a juvenile offender like Casillas believed, albeit incorrectly, to have been sentenced to probation.

Elsewhere in its written order, the trial court seemed to incorrectly equate the fact that Casillas's deferred adjudication was to be supervised by probation with being "placed on probation."

The majority implies that the district court did not misunderstand the statute or fail to apprehend the difference between being sentenced to probation and being ordered supervised by probation while on a deferred adjudication. Maj. op. ¶ 12. Instead, asserts the majority, the district court had an insufficient record before it, which caused it to inaccurately believe Casillas had been sentenced to probation. Id. The record does not support the majority's perception. In its written order denying the motion to suppress, the district court expressly noted that Casillas had "entered into a deferred adjudication" and "was also placed on probation." Later in the same order, the district court reiterated that it "appear[ed] undisputed that [Casillas] had been placed on a deferred adjudication with probation." Thus, contrary to the majority's characterization, the district court did not rely on a "mistaken factual premise"; rather, the district court mistakenly believed, as did the juvenile probation officer, that Casillas's probation-supervised deferred adjudication meant he was "an offender sentenced to probation" who was subject to the collection requirement in subsection (1)(e). Id.